ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JAY H. ROBINSON (California Bar No. 230015)
Assistant United States Attorney
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4138
    Facsimile: (213) 894-0141
    E-mail: jay.robinson@usdoj.gov

Attorney for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CR No. 10-00299-MMM |
| ) | |
| Plaintiff, ) | GOVERNMENT'S OPPOSITION TO |
| ) | DEFENDANT SAAK AVAKYANTS'S |
| v. ) | MOTION TO SUPPRESS STATEMENTS; |
| ) | DECLARATIONS; EXHIBITS |
| SAAK AVAKYANTS, et al., ) | |
| ) | HEARING DATE: 08/23/2010 |
| Defendants. ) | HEARING TIME: 1:15 p.m. |
| ) | |
| ) | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files its opposition to Saak Avakyants' ("defendant's") motion to suppress.

    The government's opposition is based upon the attached memorandum of points and authorities, the attached declarations of Daryl Diamond and Matthew Mayo, the files and records in

//

//

this case, and any other evidence or argument that the government may present at a hearing on this matter.

DATED: August 3, 2010                    Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


     /s/
JAY H. ROBINSON
Assistant United States Attorney

Attorneys for Plaintiff
United States of America

TABLE OF CONTENTS

PAGE

I.  INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STATEMENT OF FACTS.. . . . . . . . . . . . . . . . . . . . . . 2

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    a.  Defendant knowingly and intelligently waived his
        <u>Miranda</u> Rights. . . . . . . . . . . . . . . . . . . . . 6

    b.  Defendant voluntarily agreed to speak to Special
        Agent Diamond about defendant's participation in
        an ongoing criminal conspiracy. . . . . . . . . . . 10

IV. CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . 12

TABLE OF AUTHORITIES

PAGE

Blackburn v. Alabama,
    361 U.S. 199 (1960). . . . . . . . . . . . . . . . . . . . 10

Colorado v. Connelly,
    479 U.S. 157 (1986). . . . . . . . . . . . . . . . . . . . . 7

Colorado v. Spring,
    479 U.S. 564 (1987). . . . . . . . . . . . . . . . . . . . . 7

Correll v. Thompson,
    63 F.3d 1279 (4th Cir. 1995).. . . . . . . . . . . . . . . . 8

Terranova v. Kincheloe,
    912 F.2d 1176 (9th Cir 1990).. . . . . . . . . . . . . . . 11

U.S. v. Shi,
    525 F.3d 709 (9th Cir. 2008).. . . . . . . . . . . . . . . 10

United States v. Guerrero,
    847 F.2d 1363 (9th Cir. 1988). . . . . . . . . . . . . . . 10

U.S. v. Bernard S.,
    795 F.2d 749 (9th Cir. 1986).. . . . . . . . . . . . . . . . 7

U.S. v. Doe,
    155 F.3d 1070 (9th Cir. 1998). . . . . . . . . . . . . . . . 7

U.S. v. Guay,
    108 F.3d 545 (4th Cir. 1997).. . . . . . . . . . . . . . . . 8

U.S. v. Moreno,
    122 F. Supp. 2d 679 (E.D. Va. 2000). . . . . . . . . . . . . 8

U.S. v. Rodriguez-Preciado,
    399 F.3d 1118 (9th Cir. 2005).. . . . . . . . . . . 6, 7, 10

U.S. v. Sriyuth,
    98 F.3d 739 (3d Cir. 1996).. . . . . . . . . . . . . . . 8, 10

FEDERAL STATUTES

18 U.S.C. § 3501(b).. . . . . . . . . . . . . . . . . . . . . . 10

ii

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant is the leader of a five-man conspiracy to commit access device fraud. From an unknown date to March 11, 2010, defendant and his four co-conspirators used fraudulent credit cards to buy thousands of dollars of gasoline. In furtherance of this conspiracy, defendant modified two vans to hold internal gasoline tanks each capable of holding hundreds of gallons of gasoline beyond the capacity of the manufacturer-installed tanks. Defendant and his co-conspirators would drive these stealth gas-tankers to local gas stations, fill the internal tanks to capacity, and pay for the gasoline with fraudulent credit cards. Defendant and the co-conspirators would then drive to other local gas stations and sell the gasoline. For this conduct, the government charged defendant and his co-conspirators on March 25, 2010 in a 22-count indictment with violating: Title 18, United States Code, Sections 371, and 1029(a)(1) and (2): Conspiracy, and Access Device Fraud; and Title 49, United States Code, Section 5124: Unlawful Transportation of Hazardous Material.

Defendant filed a motion to suppress statements he made to federal agents at the time of his arrest. While Defendant does not contest whether probable cause existed for his arrest, defendant does contend that he did not knowingly, intelligently, and voluntarily waive his <u>Miranda</u> rights. The centerpiece of defendant's claim is defendant's alleged lack of proficiency in English.

The government opposes defendant's motion because defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights in writing prior to making incriminating statements to Agent Diamond. As a result, this court should deny defendant's motion and not suppress his statements.

**II.  STATEMENT OF FACTS**

Defendant is an Russian national living in the United States for the last seven years. Def. Declaration ¶ 2. While defendant has no prior convictions, Los Angeles County Sheriff's ("LASO") deputies arrested him on July 13, 2008 for violating California Penal Code Section 487(a): Grand Theft; Section 484f: Forging an Access Cardholder's Signature; and Section 484i: Counterfeiting Access Cards. <u>See</u> Attached Exhibit A. Specifically, LASO deputies arrested defendant for using fraudulent credit cards to buy $3,000 worth of gasoline. Ex. A at 459. Defendant, moreover, pumped the gasoline into a van that was specially modified with an internal gas tank measuring 92 inches long, 52 inches wide, and 21 inches high.[1] Ex. A at 459.

On March 11, 2010, United States Secret Service Agents executed a federal arrest warrant for defendant at his apartment in North Hollywood, California. <u>See</u> Attached Exhibit B at 468. The agents positively identified defendant and took him into custody. Declaration of Daryl Diamond ("D. Diamond Decl."), ¶ 4; Ex. B at 468. Shortly after defendant's arrest, United States

---

[1] On August 2, 2010, SA Diamond confirmed that the Los Angeles County District Attorney's Office declined to file a formal complaint against defendant after his July 13, 2008 arrest.

2

1 Secret Service Agent Daryl Diamond ("SA Diamond") sat defendant
2 on a couch in defendant's living room and asked defendant for his
3 consent to search the apartment.  D. Diamond Decl., ¶ 5; Ex. B at
4 468.  Defendant, speaking in English, verbally consented to SA
5 Diamond's request.  Id. at ¶ 5a.  SA Diamond then read to
6 defendant in English a United States Secret Service Form SSF
7 1922, "Consent to Search."  Id. at ¶ 5b.  United States Secret
8 Service Agent Matthew Mayo ("SA Mayo") and Los Angeles Police
9 Department Detective Pete Miranda were present in defendant's
10 living room when SA Diamond read to defendant the Consent to
11 Search form.  Id.  The Consent to Search form is printed entirely
12 in English, and includes the following provision:

> This written permission is given by me voluntarily.  I have not been threatened, placed under duress, or promised anything in exchange for my consent.  I have read this form, or it has been read to me, and I understand my rights and have been able to communicate with the agents/officers.

17 See Attached Exhibit E.  After SA Diamond read to defendant the
18 Consent to Search Form, defendant verbally agreed in English to a
19 search, signed his name on the form, printed the date and his
20 initials ("3/11/10 S.A."), and recorded the time he signed the
21 form ("7:15 AM").  Id.; Ex. B at 468.
22     After defendant signed the Consent to Search form, SA
23 Diamond read to defendant in English a United States Secret
24 Service Form SSF 1737B, "MIRANDA WARNING – *WARNING AS TO YOUR*
25 *RIGHTS*."  D. Diamond Decl., ¶ 6; Declaration of Matthew Mayo ("M.
26 Mayo Decl."), ¶ 4; Ex. B at 468.  SA Diamond then asked defendant
27 if he understood his Miranda rights.  D. Diamond Decl., ¶ 6a.; M.
28

Mayo Decl., ¶ 4b.  Defendant responded in English that he understood his Miranda rights, and wrote the word "yes" and his initials next to the question, "Do you understand your rights?" D. Diamond Decl, ¶¶ 6e, f; M. Mayo Decl., ¶¶ 4c, d; see Attached Exhibit F.  SA Diamond then asked defendant, "Are you willing to waive these rights and talk to us?"  D. Diamond Decl., ¶ 4d; M. Mayo Decl., ¶ 5.  Defendant verbally agreed in English to waive his Miranda rights, signed his name on the form, printed the date and his initials ("3/11/10 S.A."), and recorded the time he signed the form ("7:20 AM").  D. Diamond Decl., ¶¶ 4e-g; M. Mayo Decl., ¶¶ 5,6; see Attached Exhibit F.

During the next hour, SA Diamond interviewed defendant while speaking English.  D. Diamond Decl., ¶ 8.  At various points in the interview, SA Mayo asked defendant questions while speaking English.  D. Diamond Decl., ¶ 9; M. Mayo Decl., ¶ 7.  Defendant both understood SA Mayo's questions and provided answers to SA Mayo in English.  D. Diamond Decl., ¶ 9; M. Mayo Decl., ¶ 7. United States Immigration and Customs Enforcement ("ICE") Agent Alexander Levitin ("Agent Levitin") was also present in defendant's apartment during his interview.  D. Diamond Decl., ¶ 10; M. Mayo Decl., ¶ 8.  Agent Levitin asked defendant questions while speaking Russian.  D. Diamond Decl., ¶ 10a.; M. Mayo Decl., ¶ 7.  Agent Levitin's questions, however, pertained to defendant's family and not the substance of SA Diamond's

//
//
//

interview.[2]  D. Diamond Decl., ¶¶ 10a, b.  At no point in the interview, furthermore, did defendant ask for an interpreter.  Id. at ¶ 18.

At the beginning of his interview, defendant denied knowing why SA Diamond and the other agents were standing in defendant's home.  D. Diamond Decl., ¶ 11; Ex. B at 468; see Attached Exhibit C.  Defendant claimed he worked as a taxi cab driver on weekends and took care of his children during the week.  D. Diamond Decl., ¶ 12; Exs. B at 468; C.  Defendant also admitted owning two vans that he did not drive.  D. Diamond Decl., ¶ 13; Exs. B at 468; C.  According to defendant, "other Armenians" who were not his friends paid defendant $400 per week to drive defendant's vans.  D. Diamond Decl., ¶ 13; Exs. B at 468; C.

At first, defendant claimed he did not know what the other drivers did with his vans.  D. Diamond Decl., ¶ 14; Exs. B at 468; C.  Defendant, however, relented and confessed to SA Diamond that his vans were used to buy gasoline using credit cards.  D. Diamond Decl., ¶ 14; Exs. B at 468; C.  Defendant also admitted that "the blue van is worked more than the white van because the white van is sometimes broken."  D. Diamond Decl., ¶ 15; Exs. B at 468; C.  When asked about the credit cards he used for buying gasoline, defendant stated he bought them "somewhere on a Los Angeles street corner" for $10 to $20 dollars per card.

---

[2] The government has been unable to contact Agent Levitin regarding his recollection of defendant's post-arrest interview.  Prior to the August 23, 2010 hearing, however, the government will file a supplement to its opposition that contains Agent Levitin's declaration.

5

D. Diamond Decl., ¶ 16; Exs. B at 468; C.  Defendant confirmed to SA Diamond that he went to the street corner once every two months to buy 5 to 10 cards at a time.  D. Diamond Decl., ¶ 16; Exs. B at 468; C.

After detailing to SA Diamond how he buys the credit cards, defendant refused to answer any further questions.  D. Diamond Decl., ¶ 17; Ex. B at 469.  Defendant then said "he was going to jail if he spoke to [the agents] or not so he was ready to go to jail."  D. Diamond Decl., ¶ 17; Ex. B at 469.

### III. ARGUMENT

Defendant claims that the totality of the circumstances surrounding his arrest and subsequent interview "make it extremely doubtful that [he] intelligently and voluntarily waived his *Miranda* rights and then made a voluntary statement."  Def. Mot. to Suppress at 6.  Defendant's entire argument, moreover, hinges on his alleged inability to proficiently converse in English.  Id.  According to defendant, his difficulty in understanding English "was no doubt aggravated by the facts that he was arrested early in the morning in his home and in his underwear."  Id.  Defendant is wrong.

    **a.  Defendant knowingly and intelligently waived his *Miranda* Rights**

"For a waiver of rights to be valid it must be voluntarily, knowingly, and intelligently given.  Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of the defendant."  U.S. v. Rodriguez-Preciado, 399 F.3d 1118, 1127 (9th

Cir. 2005) (citing U.S. v. Doe, 155 F.3d 1070, 1074 (9th Cir. 1998). When a defendant challenges a Miranda waiver, the government must show by a preponderance of the evidence that the waiver was both "voluntary" and "knowing and intelligent." Colorado v. Spring, 479 U.S. 564, 573 (1987); Colorado v. Connelly, 479 U.S. 157, 168 (1986). A waiver, furthermore, is knowing and intelligent if, under the totality of the circumstances, it is made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Rodriguez-Preciado, 399 F.3d at 1127.

In this case, defendant signed and dated a standardized Miranda waiver form. "Although not dispositive, a written waiver of one's *Miranda* rights is strong evidence that the waiver is valid." U.S. v. Bernard S., 795 F.2d 749, 753, n.4 (9th Cir. 1986) (internal quotation marks and citations omitted). Defendant, however, claims that while he "thought at the time that [he] understood most of what [the agents] said to [him]," he now realizes he "did not understand that [he] could have an attorney for free if [he] did not have the money to hire one." Def. Decl. at ¶¶ 5, 6. Defendant, moreover, adds context to his misunderstandings by erecting a language barrier:

> My native languages that I speak well are Russian and Armenian. I moved to the United States approximately seven or eight years ago and have learned some English, but I do not speak it very well. Still, because I live in this country, I try to use English whenever I can.

Def. Decl. at ¶ 2.

While a limited ability to understand English may render a waiver of rights defective, "such a circumstance does not

7

1 necessarily thwart an effective waiver." U.S. v. Guay, 108 F.3d
2 545, 549 (4th Cir. 1997).  Other relevant factors include:
3 whether the defendant affirmatively indicated he understood his
4 rights; whether the defendant indicated he understood English;
5 the length of defendant's residency within the United States; and
6 the defendant's previous encounters with the criminal justice
7 system.  U.S. v. Moreno, 122 F.Supp.2d 679, 681 (E.D. Va. 2000)
8 (citing Guay, 108 F.3d at 549; U.S. v. Sriyuth, 98 F.3d 739, 750
9 (3d Cir. 1996); Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir.
10 1995).

11    Defendant's personal background and part-time profession
12 erode the foundation of his alleged language barrier.  Defendant
13 admits he has lived in the United States for nearly eight years
14 and tries to speak English whenever possible.  Def. Decl. at ¶ 2.
15 Defendant, furthermore, drives a taxi cab on weekends to earn
16 extra money.  Out of necessity, taxi drivers in the United States
17 need to understand English for three extremely important reasons:
18 first, cab drivers need to understand their passengers'
19 directions; second, cab drivers must be able to read, comprehend,
20 and follow street signs and traffic signals; and third, if cab
21 drivers expect to be paid, then cab drivers have to communicate
22 to their passengers the cost of rendered services.  In his
23 declaration, defendant tacitly admits he possesses all of these
24 qualities.  Defendant's proficiency in English, therefore, is
25 necessary for him to put food on the table.

26    Defendant's demeanor and behavior during his interview,
27 moreover, completely undermine his asserted post-arrest language

28

barrier.  While English is not defendant's native language, both SA Diamond and Mayo recall defendant engaging the agents in an English conversation for the better part of an hour.  According to Diamond and Mayo, at no time did defendant indicate he was either lost in the conversation or ask for an interpreter.  At one point, defendant even spoke Russian to Agent Levitin and then returned to an English conversation with SA Diamond.

   By his own admission, defendant understood his right to remain silent and to have an attorney present during questioning.  Def. Decl. at ¶ 6.  Defendant was not only aware of these rights, but also of the potential consequences of waiving them.  "I thought it was better for me not to talk to the agents, but I talked to them anyway."  Def. Decl. ¶ 7.  Defendant's statement is indicative of a person who: understands English; applies critical-thinking skills in the middle of a stressful situation; reasons through possible consequences of his decisions; and remains willing to bear the full weight of his choices.

   Noticeably absent from defendant's declaration, however, is his familiarity with the criminal justice system.  Defendant was arrested in 2006 for conduct identical to defendant's actions in this case.  Ex. A.  In light of his previous arrest, defendant may have offered a "Freudian slip" when he told SA Diamond that "he was going to jail if he spoke to [the agents] or not so he was ready to go to jail."  D. Diamond Decl., ¶ 17; Ex. B at 469.  Defendant's own words and actions subvert the "extreme [doubt]" defendant places in the sufficiency of his <u>Miranda</u> waiver.  Def. Mot. to Suppress at 6.  The totality of the circumstances,

9

therefore, shows defendant knowingly and intelligently waived his Miranda rights. See U.S. v. Shi, 525 F.3d 709, 728-29 (9th Cir. 2008); U.S. v. Sriyuth, 98 F.3d 739, 748-50 (3d Cir. 1996).

      **b.    Defendant voluntarily agreed to speak to Special Agent Diamond about defendant's participation in an ongoing criminal conspiracy**

"Before a criminal defendant's statement can be used against him, the government must prove its voluntariness by a preponderance of the evidence." United States v. Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988). An inculpatory statement is voluntary only when it is "the product of a rational intellect and a free will." Blackburn v. Alabama, 361 U.S. 199, 208 (1960). "A waiver is voluntary if, under the totality of the circumstances, the confession was the product of a free and deliberate choice rather than coercion or improper inducement." Rodriguez-Preciado, 399 F.3d at 1128.

Congress codified the "totality of the circumstances" test at Title 18, United States Code section 3501(b), and identified the following factors a court should consider in determining voluntariness:

> (1) the time elapsing between the arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment; (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession; (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him; (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b). According to the statute, the presence or

10

1 absence of any of these factors is not conclusive on the issue of
2 voluntariness.
3    In this case, the totality of the circumstances demonstrates
4 that defendant's incriminating statements did not result from
5 either coercion or improper inducement.  SA Diamond interviewed
6 defendant within a short time after his arrest.  By 7:20 a.m. on
7 the morning of his arrest, defendant consented both verbally and
8 in writing not only to a search of his apartment, but also to a
9 waiver of his Miranda rights.  Exs. E, F.  While an attorney was
10 not present during defendant's voluntary interview, defendant
11 acknowledged he had a right to remain silent and a right to
12 counsel.  Def. Decl. at ¶ 6.
13    Defendant, however, claims he agreed to speak to SA Diamond
14 because "[he] was scared at the time, and [he] signed a form [the
15 agents gave him] because [he] was scared."  Def. Decl. at ¶ 7.
16 The agents, however, did not have any weapons drawn on him and
17 they interviewed him in his own home.  Indeed, the Ninth Circuit
18 has upheld the validity of a Miranda waiver under circumstances
19 far more coercive than defendant claims existed in this case.
20 See Terranova v. Kincheloe, 912 F.2d 1176, 1179-80 (9th Cir 1990)
21 (suspect validly waived his Miranda rights by speaking to
22 officers after the officers arrested the suspect without a
23 warrant, handcuffed him, and while the officers conducted what
24 the suspect considered to be a "warrantless search of his
25 apartment.")  Defendant was scared because he knew he was guilty.
26 The court should see defendant's declaration for what it is: the
27 self-serving statements of a man who is conscious of his guilt
28

and desperate to avoid any accountability for his role in an ongoing criminal conspiracy.

**IV.   CONCLUSION**

    For all of the foregoing reasons, the Court should deny defendant's motion to suppress.

DATED: August 3, 2010        Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

     /s/
JAY H. ROBINSON
Assistant United States Attorney

Attorneys for Plaintiff
United States of America